# FOR PUBLICATION

FOR PUBLICATION

FILED & ENTERED

JAN 20 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY hawkinso DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

In re

Michael Lynn Richter,

Debtor.

Case No. 6:14-bk-10231-SY

Chapter 13

**MEMORANDUM DECISION ON RUSTLING OAKS, LLC'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY (UNLAWFUL DETAINER)**

Before the Court is a motion by Rustling Oaks, LLC ("Rustling Oaks") for relief from the automatic stay to commence an unlawful detainer proceeding against the debtor Michael Lynn Richter ("Debtor") and evict Debtor from his residence, which Rustling Oaks purchased at a prepetition foreclosure sale. The sale, however, was subject to Debtor's postsale right of redemption under California law, which is available to the prior owners of real property sold in a nonjudicial foreclosure by a homeowners' association on its lien for delinquent assessments. Debtor confirmed a Chapter 13[1] plan without objection that he characterizes as exercising this right. The

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

1    broad issue here is whether relief from the automatic stay is warranted in light of

2    Debtor's purported redemption through his plan.

3        For the reasons set forth below, the Court will regrettably grant Rustling

4    Oaks' motion. The automatic stay as to the property will be annulled retroactively to

5    validate certain actions taken by the foreclosure trustee, and Rustling Oaks will be

6    entitled to begin its unlawful detainer proceeding to gain possession of the property.

7    1.  FACTUAL BACKGROUND.

8        In 2000, Debtor purchased a condominium unit within a country club in Palm

9    Desert, California (the "Residence"). As part of a common interest development, the

10   Residence is subject to a set of covenants, conditions, and restrictions (the "CC&Rs")

11   enforced by the development's homeowners' association, Marrakesh Community

12   Association ("MCA"); one of those CC&Rs requires the condo owner to pay various

13   assessments to MCA. If assessments are not paid, the CC&Rs allow a trustee

14   designated by MCA to initiate a nonjudicial foreclosure of the Residence.

15       Debtor became delinquent on his assessments. The delinquencies prompted

16   MCA to execute and record a Notice of Assessment Lien in February 2013, indicating

17   that it had a lien in the amount of $7,206.08 for unpaid assessments, interest, and

18   related fees. In the Notice, MCA designated the law firm Wayne S. Guralnick, APLC

19   ("Guralnick") to act as the foreclosure trustee.

20       The delinquencies continued, so Guralnick, on behalf of MCA, began the

21   nonjudicial foreclosure process by recording in May 2013 a Notice of Default and

22   Election to Sell Pursuant to Assessment Lien and the Provisions of the Declaration of

23   Restrictions. Guralnick then recorded a Notice of Trustee's Sale in September 2013,

24   which stated that the Residence would be sold at public auction on October 10, 2013.

25       The auction took place as scheduled. By this date, the total unpaid debt to

26   MCA reached $18,836. At the auction, Rustling Oaks, a third party unrelated to

27   MCA, became the highest bidder, purchasing the Residence for $36,000. After

28

2

1  Rustling Oaks paid the purchase price,[2] Guralnick recorded the Certificate of

2  Foreclosure Sale Subject to Redemption on October 17, 2013. The Certificate

3  informed Debtor that he had 90 days from the sale date to redeem the Residence.

4       On January 8, 2014, the final day of the redemption period, Debtor filed his

5  Chapter 13 petition. Formal notice of the bankruptcy filing was provided to MCA and

6  Guralnick, but not to Rustling Oaks. These three entities did not file a proof of claim

7  or otherwise participate in Debtor's bankruptcy case.

8       Using this district's mandatory form, Debtor then proposed a Chapter 13 plan

9  that he believed was sufficient to redeem the Residence from the foreclosure sale (the

10  "Plan"). Debtor listed MCA in Class 2 of the Plan, which is intended for the "cure and

11  maintenance" of claims secured by a debtor's principal residence. In this class, Debtor

12  proposed to directly pay MCA the ongoing postconfirmation assessments (the

13  maintenance) outside of the Plan and to pay MCA through the Plan a total of $18,836

14  over 60 months (the cure).[3]

15       Although Debtor's intention was to exercise his right of redemption through

16  the Plan, nothing on the face of the Plan (other than possibly the mere inclusion of

17  MCA's name in Class 2) signaled this intention. The Plan's miscellaneous provisions,

18  where a debtor is permitted to add his own custom language, did not mention

19  Rustling Oaks, the prepetition foreclosure sale, or Debtor's right of redemption.[4]

20  Rather, the Plan's treatment of MCA's claim in Class 2 resembled what is commonly

21  proposed for the cure and maintenance of home mortgages in default. Like with the

22

23  _____

       [2] The total debt owed to MCA was paid in full from the sale proceeds.

24       [3] The operative language of the Plan specifically provided, "The postconfirmation

25  monthly mortgage payment will be made by the Debtor directly to . . . [MCA]," and, "The
   Debtor will cure all prepetition arrearages for the primary residence through the Plan

26  Payment as set forth below," then listing MCA and the $18,836 arrearage.

       [4] Debtor did specifically reference his Residence in the Plan by inserting the following

27  language into one of the Plan's form provisions: "Debtor has listed his residence for sale and
   is aggressively seeking a buyer or reverse mortgage options. A contribution will be made in

28  the 7th month if the property has not sold or been refinanced."

3

1   petition, MCA and Guralnick, but not Rustling Oaks, received notice of the Plan, but

2   neither of them filed an objection. The Plan was then confirmed on March 24, 2014.

3       MCA began receiving payments from the Chapter 13 trustee and Debtor. But

4   Guralnick, on MCA's behalf, returned the checks in May 2014 and informed the

5   trustee and Debtor that MCA could not accept payments for delinquent or ongoing

6   assessments because MCA had been paid in full from the sale proceeds and Rustling

7   Oaks was the new owner of the Residence. Up until then, the trustee was apparently

8   unaware that the Residence had been sold in a prepetition foreclosure sale.

9       Debtor's counsel then exchanged emails with Guralnick, in which she insisted

10  that her client had successfully redeemed the Residence through the Plan and that

11  she would initiate an adversary proceeding to redress the alleged violations of the

12  automatic stay if this situation between Debtor, Guralnick, MCA, and Rustling Oaks

13  could not be resolved. In response to counsel, Guralnick explained its position, that

14  "the Chapter 13 plan providing [for] the HOA prepetition payments [made] no sense"

15  and that "[i]f [Debtor] wanted to redeem the property, he would need to pay [Rustling

16  Oaks] in full at the time of redemption so that [Rustling Oaks] receives all [of] its

17  funds back." Although nothing was resolved between the parties, Debtor never filed

18  an adversary proceeding.

19      Two months later, in July, Guralnick sent letters to Debtor's counsel and the

20  trustee informing them of its intention to record the Trustee's Deed. Receiving no

21  response, Guralnick executed the Trustee's Deed on July 28, 2014, and then recorded

22  it on August 1, 2014, perfecting Rustling Oaks' legal title in the Residence.

23      On October 7, over six months after confirmation, Rustling Oaks filed its

24  motion for relief from the automatic stay, which Debtor vehemently opposed. An

25  initial hearing on the motion was held on October 29, where the Court heard oral

26  argument and allowed the parties to submit supplemental briefs. Following the

27  submission of those briefs, the Court entertained final oral argument at the

28  continued hearing on December 17.

4

1  2.  JURISDICTION.

2       This memorandum decision contains the Court's findings of fact and

3  conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable

4  to this contested matter by Bankruptcy Rules 7052 and 9014(c). The Court has

5  jurisdiction under 28 U.S.C. § 1334 and 11 U.S.C. § 362, and this is a core proceeding

6  under 28 U.S.C. § 157(b)(2)(G).

7  3.  DISCUSSION.

8       3.1.**Introduction**.

9       An entity seeking to evict a debtor from and gain possession of real property

10  must first obtain relief from the automatic stay under § 362(d) because the stay

11  protects the debtor's physical occupation of real property, a possessory interest under

12  California law. See <u>Eden Place, LLC v. Perl (In re Perl)</u>, 513 B.R. 566, 576 (B.A.P. 9th

13  Cir. 2014). Here, wishing to initiate an unlawful detainer proceeding against Debtor

14  after a prepetition foreclosure sale and the expiration of the redemption period,

15  Rustling Oaks argues that cause exists under § 362(d)(1) to grant stay relief.[5]

16       Debtor contends that stay relief is not warranted for a number of reasons. His

17  opposition and supplemental brief can be boiled down to essentially three major

18  arguments: (1) That the Bankruptcy Code allows Debtor to redeem the Residence

19  through the Plan; (2) that the Plan's res judicata effect precludes Rustling Oaks from

20  moving for stay relief; and (3) that Rustling Oaks' title is premised on a void

21  Trustee's Deed recorded postpetition, making stay relief for an unlawful detainer

22  proceeding premature at this time. The Court considers each argument below.

23

24

25

26

27       [5] Rustling Oaks did not request relief under § 362(d)(2). Therefore, the Court does not
    need to consider Debtor's arguments regarding his equity in the Residence and how the
28  Residence is necessary to his reorganization.

3.2. **The Unexpired Statutory Right of Redemption in a Chapter 13 Case**.

    3.2.1. <u>The Right of Redemption under California Law.</u>

In California, an owner facing foreclosure of his real property is entitled to redeem it. There are, however, two separate rights of redemption available to him.

Before the property is sold in the foreclosure sale, the owner has an equitable right of redemption (or equity of redemption), which allows him to pay the entire debt owed to the foreclosing lienholder "at any time prior to the sale to avoid loss of the property." <u>Knapp v. Doherty</u>, 123 Cal. App. 4th 76, 87 (2004) (citing Cal. Civ. Code §§ 2903, 2905). This redemption has the effect of satisfying the debt, extinguishing the lien, and terminating the power of sale. <u>See</u> <u>Nguyen v. Calhoun</u>, 105 Cal. App. 4th 428, 440 (2003). But the foreclosure sale extinguishes the owner's right to equitably redeem the property. <u>See</u> <u>Moeller v. Lien</u>, 25 Cal. App. 4th 822, 831 (1994).

Following the foreclosure sale, a statutory right of redemption (or statutory redemption) may be available under certain circumstances, which gives the now-former owner "an opportunity to regain ownership of the property by paying the foreclosure sale price [to the purchaser], for a period of time after foreclosure." <u>Alliance Mortg. Co. v. Rothwell</u>, 10 Cal. 4th 1226, 1236 (1995). An effective redemption terminates the effect of the sale and restores the former owner to the estate sold at the foreclosure sale. Cal. Civ. Proc. Code § 729.080(d). The purpose of a postsale right of redemption is "to force the purchaser at [the foreclosure] sale to bid the property in at a price approximating its fair value." <u>Salsbery v. Ritter</u>, 48 Cal. 2d 1, 11 (1957).

The statutory right of redemption under California law though does not exist in all foreclosure scenarios. While a judicial foreclosure sometimes provides the prior owner with this right, a nonjudicial foreclosure generally does not. <u>See</u> <u>Alliance Mortg.</u>, 10 Cal. 4th at 1236; <u>see also</u> Cal. Civ. Proc. Code §§ 726(e), 729.010(a). There is, however, a narrow exception. The nonjudicial foreclosure by a homeowners'

1  association on its lien for delinquent assessments[6] is subject to statutory redemption,

2  allowing the former owner to redeem within 90 days of the foreclosure sale. See Cal.

3  Civ. Code § 5715(b); Cal. Civ. Proc. Code § 729.035.

4      It is undisputed that Debtor did not equitably or statutorily redeem his

5  Residence in accordance with applicable California law. He did not pay the entire

6  amount of the delinquent assessments prior to the foreclosure sale, and he did not

7  pay the purchase price of the Residence in full within 90 days of the sale. Instead,

8  Debtor filed his petition before the statutory redemption period expired and then

9  proposed and confirmed his Plan that pays MCA, the homeowners' association, the

10  amount of the delinquent assessments over a 60-month term. Debtor characterizes

11  this as his lawful redemption through the Plan. In response, Rustling Oaks contends

12  that the Bankruptcy Code does not allow a plan to do this.

13      The first issue in this matter is whether the Bankruptcy Code permits Debtor

14  to do what his Plan has proposed.[7] Although this inquiry appears straightforward,

15  the difficulty in addressing the issue is that what has been proposed within the four

16  corners of Debtor's Plan is not the same as what Debtor's papers argues his Plan has

17  done. On the one hand, the Plan provides for the repayment of MCA's $18,836

18  arrearage, which suggests that Debtor is attempting to cure the default, rather than

19  exercise and modify his statutory right of redemption. See McCarn v. WyHy Fed.

20      [6] If property within a common interest development is subject to assessments, then a
homeowners' association in charge of managing that development is entitled to a lien on the
21  property for the amount of any delinquent assessments. See Cal. Civ. Code § 5675(a). The
homeowners' association can enforce the assessment lien by a trustee's sale (i.e., a
22  nonjudicial foreclosure). See id. § 5700(a) (stating that lien "may be enforced in any manner
permitted by law, including . . . sale by the trustee designated in the notice of delinquent
23  assessment"); id. § 5710(a) (providing that "[a]ny sale by the trustee shall be conducted in
accordance with Sections 2924, 2924b, and 2924c applicable to the exercise of powers of sale
24  in mortgages and deeds of trust").

25      [7] Citing Multnomah County v. Ivory (In re Ivory), 70 F.3d 73 (9th Cir. 1995), Debtor
argues that because his Plan has already been confirmed, the Court cannot disturb his Plan.
26  However, as discussed below, the Plan is ambiguous and confusing at best regarding the
proposed treatment of the dispute with MCA, Guralnick, and Rustling Oaks. The Court
27  therefore will exercise its inherent power to interpret and enforce its own orders and
confirmed plans. See Wilshire Courtyard v. Cal. Franchise Tax Board (In re Wilshire
28  Courtyard), 729 F.3d 1279, 1289–90 (9th Cir. 2013).

1  Credit Union (In re McCarn), 218 B.R. 154, 162 (B.A.P. 10th Cir. 1998) (explaining

2  how exercising a statutory right of redemption "is separate from the ability to 'cure' a

3  default in a chapter 13 plan"). On the other hand, Debtor's opposition and

4  supplemental brief, while making some reference to curing defaults and even citing

5  to cases considering the right to cure, have primarily focused on the argument that

6  Debtor exercised his right of redemption through the Plan and that "[f]ederal law

7  allows that redemption to be reorganized in chapter 13." Due to the inconsistency,

8  Debtor has not articulated a cohesive argument on this first issue.

9      To alleviate further confusion, the Court believes that the following question

10 better expresses the heart of the first issue: When a foreclosure sale of a debtor's

11 principal residence has occurred prepetition and the debtor then files a Chapter 13

12 petition before his statutory right to redeem expires, what are his options under the

13 Bankruptcy Code to save his residence?[8]

14      3.2.2.  The Curing of Defaults Under § 1322(b)(3) and (b)(5).

15      Debtor contends that one option to save the Residence is found in the broad

16 cure provisions of § 1322(b)(3) and (b)(5), which set forth that a debtor may propose a

17 plan that "provide[s] for the curing of any default." "[T]he plain meaning of 'cure,' as

18 used in § 1322(b)(3) and (5), provides a debtor with the right to remedy a default and

19 restore matters to the status quo ante. In other words, cure will nullify all

20 consequences of default." Frazer v. Drummond (In re Frazer), 377 B.R. 621, 630

21 (B.A.P. 9th Cir. 2007) (citations omitted). The argument is that the cure provisions

22 would allow Debtor to propose a plan that would basically undo the foreclosure sale

23 and reinstate his presale obligation to pay the assessments to MCA.

24      Debtor argues that these cure rights are available to him so long as, on the

25 petition date, he retains an interest in the Residence or his right to redeem has not

26

27      [8] As a matter of fairness to Debtor and because the Court is sympathetic to Debtor's
plight of losing his primary residence, the Court will consider every possible argument that
28 can be extracted from Debtor's papers.

1    yet expired. However, he fails to acknowledge § 1322(c)(1), a limitation placed on

2    § 1322(b)(3) and (b)(5), that states,

3

4        (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy
     law—

5            (1) a default with respect to, or that gave rise to, a lien on the
     debtor's principal residence may be cured under paragraph (3)

6            or (5) of subsection (b) <u>until such residence is sold at a foreclosure
     sale</u> that is conducted in accordance with applicable

7            nonbankruptcy law . . . .

8    11 U.S.C. § 1322(c)(1) (emphasis added). The provision was added to the Bankruptcy

9    Code in 1994, <u>see</u> Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 301, 108

10   Stat. 4106, 4131, as a way for Congress to reconcile a circuit split and address when a

11   debtor's right to cure a default under § 1322(b)(3) or (b)(5) is extinguished,[9] <u>see</u> H.R.

12   Rep. No. 103-835, at 52 & n.18 (1994), <u>reprinted in</u> 1994 U.S.C.C.A.N. 3340, 3361.

13   Since Debtor seeks to cure a default with respect to a lien on his principal residence

14   and the lien can be enforced via a foreclosure sale, § 1322(c)(1) is an applicable

15   limitation on his Plan. <u>See</u> <u>Frazer</u>, 377 B.R. at 628–29.

16       Under this provision, the right to cure a default involving a lien on a debtor's

17   principal residence is permitted but only "until such residence is sold at a foreclosure

18   sale that is conducted in accordance with applicable nonbankruptcy law." 11 U.S.C.

19   § 1322(c)(1). Courts are split on when a "residence is sold at a foreclosure sale," with

20   many adopting the "gavel rule" and others adopting the "deed-delivery rule."

21

22       [9] Specifically, Congress intended to supersede the rule from <u>In re Roach</u>, 824 F.2d
     1370, 1379 (3d Cir. 1987) (holding that right to cure "does not extend beyond the entry of a

23   foreclosure judgment"), and to codify the rule from <u>Federal Land Bank of Louisville v. Glenn
     (In re Glenn)</u>, 760 F.2d 1428, 1435 (6th Cir. 1985) ("The event we choose as the cut-off date of
     the statutory right to cure defaults is the sale of the mortgaged premises."), and <u>Clark v.</u>

24   <u>Federal Land Bank of St. Paul (In re Clark)</u>, 738 F.2d 869, 874 (7th Cir. 1984) (holding that
     debtor can cure after foreclosure judgment but expressing no opinion about debtor's right to

25   cure after foreclosure sale). <u>See</u> H.R. Rep. No. 103-835, at 52 & n.18 (1994), <u>reprinted in</u> 1994
     U.S.C.C.A.N. 3340, 3361. Prior to § 1322(c)(1)'s addition to the Code, this circuit's

26   bankruptcy appellate panel (the "BAP") agreed with the majority of the circuits that "the
     foreclosure sale is the correct point to cutoff the right to cure." <u>Oregon v. Hurt (In re Hurt)</u>,

27   158 B.R. 154, 160 (B.A.P. 9th Cir. 1993); <u>see also</u> <u>Or. Dep't of Veterans' Affairs v. Braker (In</u>

28   <u>re Braker)</u>, 125 B.R. 798, 801 (B.A.P. 9th Cir. 1991).

1    The courts adopting the gavel rule, including most of the courts of appeals and

2    the BAPs that have considered § 1322(c)(1), conclude that the statutory language is

3    unambiguous, that when property is "sold at a foreclosure sale" refers to a specific

4    event and not to a multistep process, and that this provision cuts off a debtor's right

5    to cure a default at the conclusion of the foreclosure auction, rather than a later point

6    in time. See, e.g., In re Connors, 497 F.3d 314, 319–21 (3d Cir. 2007); Cain v. Wells

7    Fargo Bank, N.A. (In re Cain), 423 F.3d 617, 620–21 (6th Cir. 2005); TD Bank, N.A.

8    v. LaPointe (In re LaPointe), 505 B.R. 589, 597 (B.A.P. 1st Cir. 2014); McCarn, 218

9    B.R. at 160–62; In re Bobo, 246 B.R. 453, 456–59 (Bankr. D.C. 2000); see also

10   Commercial Fed. Mortg. Corp. v. Smith (In re Smith), 85 F.3d 1555, 1558 n.3 (11th

11   Cir. 1996) (dicta).

12   In contrast, the other courts, who have adopted the deed-delivery rule, have

13   usually concluded that § 1322(c)(1) is ambiguous and requires looking at legislative

14   history, that when property is "sold at a foreclosure sale" refers to the entire

15   foreclosure process, and that the debtor's right to cure survives until title passes to

16   the purchaser (i.e., when the debtor no longer has any interest in the property) under

17   state law, which is typically when a deed is delivered or recorded. See, e.g., In re

18   Jenkins, 422 B.R. 175, 181–82 (Bankr. E.D. Ark. 2010); In re Beeman, 235 B.R. 519,

19   524–26 (Bankr. D.N.H. 1999); see also Colon v. Option One Mortg. Corp., 319 F.3d

20   912, 920–21 (7th Cir. 2003) (suggesting that debtor has right to cure until at least

21   expiration of all rights of redemption).

22   This Court agrees with those courts adopting the gavel rule. The language in

23   § 1322(c)(1) is clear and unambiguous. "[T]he preposition 'at' in 'sold at a foreclosure

24   sale' signifies a discrete event, rather than an ongoing process," Connors, 497 F.3d at

25   320, and that discrete event must be the "auction at which the highest bidder

26   purchases the property," Cain, 423 F.3d at 620; accord Connors, 497 F.3d at 322

27   (holding that "foreclosure sale" is "'completed' with the fall of the gavel and the

28   vesting of equitable title in the winning bidder"). "To define the word 'sold' as the

10

1   point at which a deed is transferred to the prevailing bidder subsequent to the date of

2   the auction . . . removes the words 'foreclosure sale' from the statute." In re Crichlow,

3   322 B.R. 229, 234 (Bankr. D. Mass. 2004). Thus, "[t]he language of section 1322(c)(1)

4   is clear and unambiguous in establishing the date of the actual foreclosure sale as

5   the cut-off for curing a . . . default under section 1322(b)." McCarn, 218 B.R. at 160.

6   Because there is no ambiguity in the statute, the Court has no need to consult the

7   legislative history.[10] See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240–

8   41 (1989); Sloan v. Lewis, 89 U.S. (22 Wall.) 150, 155 (1874) ("If the intention of

9   Congress is manifest from what there appears we need not go further.").

10       If the Court must consider "applicable nonbankruptcy law," the result remains

11   the same in this case: Property is "sold at a foreclosure sale" at the completion of the

12   foreclosure auction under California law, rather than at the delivery or recordation of

13   the trustee's deed. In a typical trustee's sale, every bid is "deemed to be an

14   irrevocable offer by that bidder," Cal. Civ. Code § 2924h(a), and the sale is "deemed

15   final upon the acceptance of the last and highest bid," id. § 2924h(c). Therefore, "[a]s

16   a general rule, a trustee's sale is complete upon acceptance of the final bid" under

17   California law.[11] Nguyen, 105 Cal. App. 4th at 441.

---

18

19       [10] Even if the Court considered it, the legislative history is inconclusive as to
Congress's intent as some courts have concluded. See, e.g., McCarn, 218 B.R. at 161 n.5.

20   Also, the legislative history does not appear to favor adoption of the deed-delivery rule. That
rule is more in line with a prior version of § 1322(c)(1) that appeared in a bill passed by the
Senate, which allowed a debtor to cure as long as he "possesse[d] any legal or equitable

21   interest, including a right of redemption, in [the subject] real property" on the petition date.
S. 540, 103d Cong. § 301 (as passed by Senate, Apr. 21, 1994), available at

22   http://www.gpo.gov/fdsys/pkg/BILLS-103s540es/pdf/BILLS-103s540es.pdf; see also S. Rep.
No. 103-168, at 51 (1993) ("[I]f the debtor still possesses an interest in the land, such as a

23   right of redemption, then the debtors may use preemptive Federal bankruptcy rights to save
their homes from foreclosure, notwithstanding State law."), 1993 WL 444315. However, the

24   bill was never passed by the House and died in the first session of the 103rd Congress. In the
second session, the House introduced a new version of the bill that abandoned the language

25   found in the Senate's bill. See H.R. 5116, 103d Cong. § 301 (as introduced by House, Sept. 28,
1994) (allowing debtor to cure "until such residence is sold under such lien and in accordance

26   with applicable nonbankruptcy law"), available at http://www.gpo.gov/fdsys/pkg/BILLS-
103hr5116ih/pdf/BILLS-103hr5116ih.pdf. Indeed, "Congress's rejection of the Senate bill in

27   favor of the current language of § 1322(c)(1) is telling." Connors, 497 F.3d at 322.

    [11] Further, the owner's right to cure under state law in the form of an equity of

28   redemption also ends when the foreclosure sale occurs, rather than at a later time. See Cal.

1    The addition of a statutory right of redemption to the equation, however, does

2    not extend the point in which property is "sold at a foreclosure sale" from the date of

3    the foreclosure auction to the end of the redemption period. Notwithstanding this

4    postsale right, property is still sold (i.e., equitable title is transferred to the

5    purchaser) at the foreclosure auction. Cf. Foorman v. Wallace, 75 Cal. 552, 556 (1888)

6    (stating that certificate of sale is "evidence of a sale, whereby . . . the entire equitable

7    title is conditionally vested in the purchaser, subject to be defeated by a

8    redemption"). By redeeming, the prior owner has effectively terminated the sale (i.e.,

9    transferred equitable title back) and "restored [himself] to the estate therein sold at

10   the sale." Cal. Civ. Proc. Code § 729.080(d); cf. Bagley v. Ward, 37 Cal. 121, 129

11   (1869) ("The redemption is virtually a transfer of the certificate of sale."). Yet, the law

12   still acknowledges that a sale took place. It follows that California law would dictate

13   that property "is sold at a foreclosure sale" on the completion of the foreclosure

14   auction, regardless of whether a statutory right of redemption is available or not.

15       Lastly, adopting the gavel rule is a logical choice because a foreclosure sale can

16   introduce a third-party purchaser into the relationship. The rule protects such

17   purchasers "by avoiding an interpretation that turns § 1322(c)(1) into a federal

18   vehicle for divesting them of property rights acquired at foreclosure sales." Connors,

19   497 F.3d at 323; cf. Jim Walter Homes, Inc. v. Spears (In re Thompson), 894 F.2d

20   1227, 1230 (10th Cir. 1990) (pre-§ 1322(c)(1) context) ("Purchase by an independent

21   third party at a foreclosure sale raises enough additional concerns to justify ending

22   the right to cure in bankruptcy at that point.").

23       For these reasons, this Court concludes that "§ 1322(c)(1) terminates a debtor's

24   right to cure a . . . default when the gavel comes down on the last bid at the

25

26   Civ. Code § 2903 (allowing owner to redeem "before his right of redemption is foreclosed");
     Stockwell v. Barnum, 7 Cal. App. 413, 418–19 (1908) (concluding that attempted redemption

27   after completion of foreclosure auction but before delivery of trustee's deed was ineffectual).
     The gavel rule's interpretation of § 1322(c)(1) therefore does not cut off any cure rights a

28   debtor may have under California law.

1  foreclosure sale." <u>Cain</u>, 423 F.3d at 621 (internal quotation marks omitted). Because

2  the Residence "[was] sold at a foreclosure sale that [was] conducted in accordance

3  with applicable nonbankruptcy law"[12] before the petition date, Debtor could no longer

4  utilize the cure provisions of § 1322(b)(3) and (b)(5), as limited by § 1322(c)(1), to cure

5  the delinquent assessments that gave rise to MCA's lien on the Residence.

6          3.2.3.  <u>The Modification of Claims Under § 1322(b)(2).</u>

7         Debtor has also singled out § 1322(b)(2) as another argument to save his

8  Residence. Under this provision, a debtor is allowed to propose a plan that will

9  "modify the rights of holders of secured claims . . . or of holders of unsecured

10  claims."[13] 11 U.S.C. § 1322(b)(2). If viable, this would allow Debtor to exercise and

11  modify his statutory right of redemption by paying the redemption price over the

12  duration of his Plan.[14] However, Debtor's ability to do so turns on whether Rustling

13  Oaks is considered a holder of a claim, or more specifically, whether Rustling Oaks

14  holds a "claim" against Debtor or his property by reason of Debtor's right to redeem

15  by paying the redemption price to Rustling Oaks.

16         The Bankruptcy Code defines a "claim" as either a "right to payment, whether

17  or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent,

18  matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured,"

19  <u>id.</u> § 101(5)(A), or a "right to an equitable remedy for breach of performance if such

20  breach gives rise to a right to payment, whether or not such right to an equitable

21  remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed,

22  undisputed, secured, or unsecured," <u>id.</u> § 101(5)(B). The Supreme Court has

23

24      [12] Debtor has not raised any issues with the foreclosure process. Thus, the Court assumes that the foreclosure sale complied with applicable California law.

25
    [13] Debtor's position is, once again, confusing and contradictory because in the Plan, he
26  purports to treat the claim in dispute as a claim secured only by a security interest in real property that is his principal residence.

27      [14] Although Debtor referenced § 1322(b)(2) in his supplemental brief, as will be discussed in Part 3.3.2, Debtor's Plan did not demonstrate a modification of his statutory
28  right of redemption.

1    "explained that Congress intended by this language to adopt the broadest available

2    definition of 'claim.'" <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 83 (1991) (citing

3    <u>Penn. Dep't of Pub. Welfare v. Davenport</u>, 495 U.S. 552, 558, 563–64 (1990),

4    <u>superseded by statute on other grounds</u>, Criminal Victims Protection Act of 1990,

5    Pub. L. No. 101-581, 104 Stat. 2865; <u>Ohio v. Kovacs</u>, 469 U.S. 274, 279 (1985)).

6        Many courts have permitted debtors to modify their postsale right of

7    redemption that arose after a tax sale under § 1322(b)(2), concluding that the third-

8    party purchaser at the tax sale holds a "claim" under either statutory definition.[15]

9    <u>See, e.g.</u>, <u>In re LaMont</u>, 740 F.3d 397, 407–09 (7th Cir. 2014); <u>Salta Grp., Inc. v.

10   McKinney</u>, 380 B.R. 515, 520–21 (C.D. Ill. 2008), <u>appeal dismissed sub nom.</u> <u>In re

11   McKinney</u>, 610 F.3d 399 (7th Cir. 2010); <u>In re Terry</u>, 505 B.R. 660, 665–66 (Bankr.

12   E.D. Penn. 2014); <u>In re Martin</u>, 496 B.R. 323, 328–29 (Bankr. S.D.N.Y. 2013); <u>Francis

13   v. Scorpion Grp., LLC (In re Francis)</u>, 489 B.R. 262, 268–69 (Bankr. N.D. Ga. 2013);

14   <u>Hammond v. Allegheny Cnty. Treasurer (In re Hammond)</u>, 420 B.R. 633, 636 (Bankr.

15   W.D. Penn. 2009); <u>In re Bates</u>, 270 B.R. 455, 463–65 (Bankr. N.D. Ill. 2001).

16   However, this Court does not share the same view. Neither definition under § 101(5)

17   is broad enough to include this redemption relationship between a new third-party

18   purchaser and a prior owner as a "claim."

19        Under the first definition, a "claim" means a "right to payment," 11 U.S.C.

20   § 101(5)(A), and "[t]he plain meaning of 'right to payment' is nothing more nor less

21

22        [15] Other courts have disagreed and have not allowed such modifications based on
     different rationales. <u>See, e.g.</u>, <u>Tax 58 v. Froehle (In re Froehle)</u>, 286 B.R. 94, 103 (B.A.P. 8th
23   Cir. 2002) (concluding that § 1322(b)(2) does not permit debtor to pay redemption price over
     time based on holding of <u>Justice v. Valley National Bank</u>, 849 F.2d 1078, 1082–83 (8th Cir.
     1988)); <u>In re Murray</u>, 276 B.R. 869, 876 (Bankr. N.D. Ill. 2002) (holding that § 108(b) limits
24   § 1322(b)(2) with regard to redemptions), <u>abrogated by</u> <u>In re LaMont</u>, 740 F.3d 397 (7th Cir.
     2010); <u>Blue v. Town of Lake Bldg. Corp. (In re Blue)</u>, 247 B.R. 748, 751 (Bankr. N.D. Ill.
25   2000) (reasoning that tax purchaser has no right to receive payment from debtor), <u>abrogated
     by LaMont</u>, 740 F.3d 397; <u>see also</u> <u>In re Stage I Land Co.</u>, 60 B.R. 539, 542 (Bankr. D. Minn.
26   1986) (chapter 11 context) (concluding that "right of redemption cannot be transformed
     through the mere filing of a bankruptcy petition into a restructurable debt"), <u>aff'd sub nom.</u>
27   <u>Stage I Land Co. v. United States</u>, 71 B.R. 225 (D. Minn. 1986). But none of those cases have
     thoroughly analyzed whether a statutory right of redemption can be characterized as a
28   "claim."

                                              14

1  than an enforceable obligation," <u>Davenport</u>, 495 U.S. at 559. The Supreme Court has

2  suggested that an obligation is enforceable if the debtor can be threatened with the

3  loss of his liberty or property in the event of nonperformance. <u>See id.</u> at 559–60.

4  Thus, in <u>Davenport</u>, the Court held that a debtor's obligation under a court order in a

5  state criminal action to pay restitution as a condition of probation constituted a

6  "right to payment" and therefore a "claim" since "the obligation is enforceable by the

7  substantial threat of revocation of probation and incarceration." <u>Id.</u> at 559.

8      Courts have relied on this part of the Supreme Court's analysis to conclude

9  that a purchaser holds a "right to payment." <u>See, e.g.</u>, <u>Bates</u>, 270 B.R. at 464

10 (reasoning that the substantial threat of a debtor losing property, including all of its

11 equity, if the debtor does not redeem "creates a right to payment . . . on behalf of the

12 tax purchaser"); <u>McKinney</u>, 380 B.R. at 515 ("Because this 'substantial threat' of

13 losing her property hangs over the property owner, the investor [purchaser] is, for all

14 intensive purposes [sic], acting as a creditor to the bankruptcy estate."). While it is

15 true that a debtor will lose his remaining interest in the property as a consequence of

16 not redeeming, the threat of this loss alone is insufficient to establish the purchaser's

17 "right to payment." The "right to payment" requires, in addition to enforceability,

18 that there be an obligation. <u>See</u> <u>Davenport</u>, 495 U.S. at 558 (stating that language of

19 § 101(5) "reflects Congress' broad . . . view of the <u>class of obligations</u> that qualify as a

20 'claim'" (emphasis added)); <u>see also</u> H.R. Rep. No. 95-595, at 309 (1977) (providing

21 that Bankruptcy Code "contemplates that all <u>legal obligations of the debtor</u>, no

22 matter how remote or contingent, will be able to be dealt with in the bankruptcy

23 case" (emphasis added)), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6266; S. Rep. No.

24 95-989, at 22 (1978) (same), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5808. Yet, with

25 statutory redemption, what the debtor has is not an obligation or duty to pay the

26 redemption price to avoid losing ownership of the property but a voluntary <u>right</u> or

27

28

15

1  opportunity to pay the redemption price in order to regain ownership.[16] See Alliance

2  Mortg., 10 Cal. 4th at 1236. Without any entity's obligation to pay the redemption

3  price, what Rustling Oaks holds cannot be characterized as a "right to payment"

4  under § 101(5)(A).

5      A "claim" can also be a "right to an equitable remedy for breach of performance

6  if such breach gives rise to a right of payment." 11 U.S.C. § 101(5)(B). In other words,

7  a right to an equitable remedy will constitute a claim if monetary payment (i.e.,

8  money damages) can be a viable alternative remedy for breach of the underlying

9  obligation. See Top Rank, Inc. v. Ortiz (In re Ortiz), 400 B.R. 755, 766 (C.D. Cal.

10  2009). Thus, a judgment ordering specific performance from a debtor would

11  constitute a "claim" under § 101(5)(B) where a money judgment could function as a

12  sufficient remedy if specific performance is refused. See Kovacs, 469 U.S. at 280–83

13  (holding that injunction ordering debtor to clean up environmental waste was a

14  "claim" when receiver subsequently sought payment of money from debtor for the

15  costs of that cleanup).

16      Even assuming that Rustling Oaks' right to receive the Trustee's Deed after

17  the redemption period expires without payment of the redemption price constitutes a

18  "right to an equitable remedy for breach of performance," this right to an equitable

19  remedy can only become a "claim" if the underlying breach can give rise to a

20  monetary remedy. Those courts that have concluded that a purchaser has a "claim"

21  under § 101(5)(B) argue that a monetary remedy does exist in the form of a debtor's

22  payment of the redemption price. See, e.g., Francis, 489 B.R. at 268–69; Bates, 270

23  B.R. at 464–65. However, they confuse the payment of the redemption price as being

24  the remedy when it actually represents the underlying "obligation" owed to the

25  purchaser. As a result, those courts end up asserting that a debtor's breach for failing

26  _____

27      [16] The courts' consideration of this right as an interest in property that becomes
property of the estate, rather than an obligation, is also telling. See, e.g., United States ex
rel. Block v. Aldrich (In re Rigden), 795 F.2d 727, 731 (9th Cir. 1986) (stating that statutory

28  right of redemption is estate property that can be sold by a bankruptcy trustee).

1    to pay the redemption price to the purchaser gives rise to the purchaser's remedy of

2    payment of the redemption price, an argument with questionable value.

3        To the extent a debtor's failure to redeem within the required period

4    constitutes a breach of performance, the only remedy that the purchaser can obtain is

5    the right to receive the trustee's deed. The purchaser would not be entitled to a

6    money judgment against the debtor for the redemption price, and it would not be

7    entitled to a right to foreclose on the property to be paid from the sale proceeds. The

8    purchaser's only remedy is to receive the deed and full legal title to the property.

9    There are simply no alternative remedies, let alone a monetary one. Therefore,

10    Rustling Oaks' right to delivery of the Trustee's Deed following the expiration of the

11    redemption period is also not a "right to an equitable remedy for breach of

12    performance if such breach gives rise to a right of payment" under § 101(5)(B).

13        Finally, both in his papers and arguments by his counsel at the hearings on

14    the motion, Debtor has strenuously asserted that Rustling Oaks is not a creditor in

15    his bankruptcy case and thus not a holder of a claim. As a result, he is now bound by

16    that statement and estopped from asserting a contrary one. See Countrywide Home

17    Loans, Inc. v. Hoopai (In re Hoopai), 581 F.3d 1090, 1097 (9th Cir. 2009).

18        Because Rustling Oaks, as a purchaser of property subject to a statutory right

19    of redemption, does not hold a "claim" within the meaning of § 101(5)(A) or (B) by

20    reason of Debtor's right to pay the redemption price,[17] Debtor cannot rely on

21    § 1322(b)(2) to exercise and modify his right of redemption.

22

23

24

25        [17] Not only is the interpretation of a statutory right of redemption as a "claim"
unsupported by the plain language of the Bankruptcy Code, but it also allows a debtor to
26    hold a third-party purchaser hostage for potentially five years by "redeeming" the property
over the duration of a Chapter 13 plan. This cannot be what Congress intended when it
27    provided that the Bankruptcy Code "contemplates that all legal obligations of the debtor, no
matter how remote or contingent, will be able to be dealt with in the bankruptcy case."
28    H.R. Rep. No. 95-595, at 309; S. Rep. No. 95-989, at 22.

1    3.2.4.  The 60-Day Extension Under § 108(b).

2    Although Debtor can no longer cure under § 1322(b)(3) and (b)(5) and cannot

3    exercise and modify his statutory right of redemption under § 1322(b)(2), that does

4    not preclude Debtor from exercising his redemption right in a Chapter 13 case

5    entirely. Rather, the Court agrees with Rustling Oaks that § 108(b) can be an option.

6    This Code provision states,

7

8    (b) Except as provided in subsection (a) of this section, if applicable
     nonbankruptcy law . . . fixes a period within which the debtor . . . may
9    . . . cure a default, or perform any other similar act, and such period has
     not expired before the date of the filing of the petition, the trustee[18] may
10   only . . . cure, or perform, as the case may be, before the later of—

11          (1) the end of such period, including any suspension of such
            period occurring on or after the commencement of the case; or

12          (2) 60 days after the order for relief.

13   11 U.S.C. § 108(b). Exercising a right of redemption created under state law

14   constitutes "cur[ing] a default" or "perform[ing] any other similar act," falling within

15   the scope of § 108(b). See Connors, 497 F.3d at 321; Canney v. Merchants Bank (In re

16   Frazer), 284 F.3d 362, 372–73 (2d Cir. 2002); Goldberg v. Tynan (In re Tynan), 773

17   F.2d 177, 179 (7th Cir. 1985); Johnson v. First Nat'l Bank of Montevideo, Minn., 719

18   F.2d 270, 278 (8th Cir. 1983). If the redemption right has not expired by the petition

19   date, § 108(b) permits its exercise in the bankruptcy case but only before the original

20   expiration date under state law or 60 days after the petition date, whichever is later.

21   Here, the foreclosure sale took place on October 10, 2013, and California law

22   offered Debtor 90 days, until January 8, 2014, to redeem the Residence. See Cal. Civ.

23   Code § 5715(b); Cal. Civ. Proc. Code § 729.035. Since Debtor filed his petition on the

24   last day of the redemption period, § 108(b) extended that period an additional 60

25   days. Debtor therefore had until March 9, 2014, to exercise his statutory right of

26

27          [18] Although § 108(b) only grants rights to a "trustee," courts have extended these
28   rights to a Chapter 13 debtor. See, e.g., Frazer, 377 B.R. at 631 & n.13.

18

1   redemption. But now that that date has passed without Debtor depositing the

2   redemption price with Guralnick, the § 108(b) option has expired for Debtor as well.

3       **3.3. Res Judicata Effect of a Confirmed Plan**.

4       Even if the Bankruptcy Code does not permit Debtor to cure or redeem

5   through his Plan, Debtor argues that with the Plan now confirmed without an

6   objection or an appeal, res judicata binds Rustling Oaks to the Plan and precludes it

7   from attacking any of the Plan's potentially erroneous or illegal provisions.

8       It is well understood that "[o]nce a bankruptcy plan is confirmed, it is binding

9   on all parties and all questions that could have been raised pertaining to the plan are

10  entitled to res judicata effect." Trulis v. Barton, 107 F.3d 685, 691 (9th Cir. 1997)

11  (emphasis omitted). "[C]reditors are precluded from asserting any other interest than

12  that provided for them in the confirmed plan," Fietz v. Great W. Sav. (In re Fietz),

13  852 F.2d 455, 458 (9th Cir. 1988), even if the plan's provisions are illegal, Great

14  Lakes Higher Educ. Corp. v. Pardee (In re Pardee), 193 F.3d 1083, 1086 (9th Cir.

15  1999). The res judicata effect of a confirmed Chapter 13 plan is partly reflected in

16  § 1327. Cnty. of Ventura Tax Collector v. Brawders (In re Brawders), 325 B.R. 405,

17  410 (B.A.P. 9th Cir. 2005), aff'd, 503 F.3d 856 (9th Cir. 2007) (adopting the BAP's

18  opinion as its own). It reads, "The provisions of a confirmed plan bind the debtor and

19  each creditor, whether or not the claim of such creditor is provided for by the plan,

20  and whether or not such creditor has objected to, has accepted, or has rejected the

21  plan." 11 U.S.C. § 1327(a).

22      In support of his argument that Rustling Oaks is now bound by the confirmed

23  Plan's redemption of the Residence, Debtor cites to Multnomah County v. Ivory (In re

24  Ivory), 70 F.3d 73 (9th Cir. 1995), a decision in which the Ninth Circuit concluded

25  that the county, who was the foreclosing lienholder and subsequent purchaser of the

26  debtor's property, was bound by the debtor's Chapter 13 plan's redemption. Id. at 75.

27      In Ivory, the debtor became delinquent on property taxes for real property

28  located in Oregon, so the county initiated a judicial foreclosure action and obtained a

1  foreclosure judgment against the debtor and the property, resulting in a sale to the

2  county subject to the debtor's right to redeem within two years. <u>Id.</u> at 74. Less than a

3  month before the redemption period would have expired, the debtor filed a petition.

4  <u>Id.</u> He proceeded to file a proof of claim on behalf of the county, listing the amount of

5  unpaid taxes as the county's claim. <u>Id.</u> He then proposed a plan that "cure[d] the

6  property tax default and redeem[ed] the real property," which was confirmed by the

7  bankruptcy court without objection. <u>Id.</u> After the county rejected the trustee's

8  payments due to expiration of the redemption period and the preconfirmation

9  recordation of the deed, the debtor filed a motion to compel the county to accept the

10  payments as required by the plan. <u>Id.</u> at 74–75.

11      The bankruptcy court granted the motion, and the district court affirmed. <u>Id.</u>

12  at 75. On appeal to the Ninth Circuit, the court affirmed in a short opinion, rejecting

13  the county's argument that "because it was no longer a creditor of the [debtor] at the

14  time the plan was confirmed, the bankruptcy court was without jurisdiction to

15  include the County in the plan." <u>Id.</u> Rather, the court reasoned, "Even assuming that

16  the order confirming the plan was in error . . . , res judicata precludes the County

17  from bringing what amounts to a collateral challenge to that order. This is so even if

18  the bankruptcy court's error was jurisdictional." <u>Id.</u> (citations omitted). As a result,

19  the county remained bound by the confirmed plan's redemption.

20      While <u>Ivory</u> sets forth an important lesson about res judicata, the decision is

21  not as on point for this case as Debtor suggests. As later noted by the BAP, "[t]here is

22  no discussion in <u>Ivory</u> of due process, and the decision says nothing about what notice

23  the county in that case received or how that Chapter 13 plan was worded," <u>Brawders</u>,

24  325 B.R. at 416, issues that are raised by Rustling Oaks and relevant here.

25      3.3.1. <u>Providing Notice to Affected Parties.</u>

26      A confirmed plan does not have preclusive effect on a party who did not receive

27  notice sufficient to satisfy its due process rights. <u>Cf. Ellet v. Stanislaus</u>, 506 F.3d 774,

28  777 (9th Cir. 2007) ("[A] claim cannot be considered to have been provided for by the

20

1  plan if a creditor does not receive proper notice of the proceedings." (internal

2  quotation marks omitted)). The threshold for due process though is low: Due process

3  merely requires "notice reasonably calculated, under all the circumstances, to apprise

4  interested parties of the pendency of the action and afford them an opportunity to

5  present their objection." <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306,

6  314 (1950). In the context of a plan, this means "a creditor need only get ordinary

7  notice of [the] Chapter 13 plan to be bound by its terms." <u>Espinosa v. United Student</u>

8  <u>Aid Funds, Inc.</u>, 553 F.3d 1193, 1204 (9th Cir. 2008), <u>aff'd</u>, 559 U.S. 260 (2010).

9      Yet, in this case, it appears that Rustling Oaks did not receive any notice. Not

10  only did Debtor fail to give Rustling Oaks formal notice of his bankruptcy case and

11  his Plan by excluding Rustling Oaks from the list of creditors, but Debtor and his

12  counsel also made no attempts to informally contact Rustling Oaks about the

13  bankruptcy.[19] Given this lack of notice, Rustling Oaks' due process rights would be

14  violated if the Court found that it was bound by a plan that it did not know existed.

15      Debtor argues though that he did not need to give notice to Rustling Oaks, the

16  third-party purchaser, but instead, notice to MCA, the foreclosing lienholder and

17  secured creditor of Debtor, and to Guralnick, the foreclosure trustee and MCA's

18  agent, was all that was required. This argument, however, ignores "[t]he purpose of

19  notice under the Due Process Clause[, which] is to apprise the <u>affected individual</u> of,

20  and permit adequate preparation for, an impending 'hearing'" before the individual

21  "is finally deprived of his property interests." <u>Memphis Light, Gas & Water Div. v.</u>

22  <u>Craft</u>, 436 U.S. 1, 14, 16 (1978) (emphasis added) (internal quotation marks omitted).

23  It does not matter that Rustling Oaks never had a contractual or legal relationship

24  with Debtor prior to the foreclosure sale. Since the Plan sought to diminish Rustling

---

25  [19] To the extent Debtor attempts to argue that he could not ascertain the identity of
26  the purchaser of his Residence, this argument would fail. Debtor could have easily reached
   out to Guralnick, who knew due to conducting the foreclosure auction. Further, the
27  Certificate of Foreclosure Sale, which clearly identified "Rustling Oaks, LLC" as the
   purchaser, was recorded right after the sale, so Debtor's counsel could have also easily
28  discovered the purchaser's identity at the recorder's office.

1  Oaks' property interests in the Residence (i.e., either by undoing the foreclosure sale

2  or by making Rustling Oaks' title subject to a 60-month, rather than 90-day, right of

3  redemption), Rustling Oaks is an affected party entitled to notice. Cf. Citicorp Mortg.,

4  Inc. v. Brooks (In re Ex-Cel Concrete Co.), 178 B.R. 198, 205 (B.A.P. 9th Cir. 1995)

5  (voiding sale free and clear of lienholder's lien because "lack of any notice to

6  [lienholder] constituted constitutional lack of due process which could not confer in

7  personam jurisdiction on the bankruptcy court to adjudicate [lienholder's] property

8  rights").

9       3.3.2.  Providing Notice of a Plan's Treatment.

10      Further, even if Rustling Oaks did receive notice about Debtor's bankruptcy

11  case, Debtor's Plan would still not bind Rustling Oaks because the Plan's provisions

12  did not clearly describe what Debtor was trying to accomplish.

13      A "confirmed plan has no preclusive effect on issues that . . . were not

14  sufficiently evidenced in a plan to provide adequate notice to the creditor" or other

15  party affected by the plan. Enewally v. Wash. Mut. Bank (In re Enewally), 368 F.3d

16  1165, 1173 (9th Cir. 2004); cf. Shook v. CBIC (In re Shook), 278 B.R. 815, 824 (B.A.P.

17  9th Cir. 2002) ("Although a secured creditor is bound by the plan, this does not mean

18  that a debtor can void or otherwise extinguish a creditor's lien without addressing

19  the lien in the plan."). The Ninth Circuit BAP has explained,

20          [A] plan should clearly state its intended effect on a given issue.
   Where it fails to do so it may have no res judicata effect for a variety of
21      reasons: any ambiguity is interpreted against the debtor, any ambiguity
   may also reflect that the court that originally confirmed the plan did not
22      make any final determination of the matter at issue, and claim
   preclusion generally does not apply to a "claim" that was not within the
23      parties' expectations of what was being litigated, nor where it would be
   plainly inconsistent with the fair and equitable implementation of a
24      statutory or constitutional scheme.

25  Brawders, 325 B.R. at 411. In other words, a plan requires clarity to be binding.

26      Here, the treatment provided for in the Plan is bare. All that Debtor did was

27  place MCA in Class 2 of the Plan, where he proposed to directly pay MCA its

28  regularly due assessments and to cure MCA's arrearage of $18,836 over 60 months.

1  No additional information was inserted into the Plan. And as previously mentioned,

2  Debtor's counsel's confusion has made it difficult for her to articulate what the Plan

3  is attempting to accomplish. Nevertheless, the two possibilities are both deficient.

4       If Debtor intended to exercise and modify his statutory right of redemption,

5  then his Plan failed to demonstrate this entirely. First, the statutory redemption

6  under California law is paid to the purchaser, not the foreclosing lienholder. See Cal.

7  Civ. Proc. Code § 729.060(a) (requiring redeeming party to deposit the redemption

8  price with levying officer); id. § 729.080(b) (requiring levying officer to then tender

9  deposit to purchaser). Thus, the party that Debtor needed to provide for in his Plan

10  was Rustling Oaks, not MCA.

11       Debtor also incorrectly stated the amount necessary to redeem in the Plan.

12  Unlike the equity of redemption price, the statutory redemption price is not the

13  unpaid debt owed to the foreclosing lienholder, but it is essentially the amount paid

14  by the purchaser at the foreclosure sale, along with the purchaser's additional costs

15  and interest. See id. § 729.060(b), (c). Debtor's Plan improperly listed $18,836, the

16  unpaid debt owed to MCA, when it should have used $36,000, the price paid by

17  Rustling Oaks. Due to these two errors, no party could have understood that Debtor

18  was attempting to exercise his right of redemption through the Plan.

19       If Debtor intended to cure the default to MCA, simply listing MCA's name and

20  the amount of the delinquent assessments in Class 2 was also not enough. While this

21  would have been sufficient in most cases involving the typical cure and maintenance

22  of a secured claim in default, the circumstances in this case (i.e., the occurrence of a

23  prepetition foreclosure sale, the existence of a third-party purchaser, and the

24  payment of a foreclosing lienholder's claim in full from the sale proceeds) required

25  more unequivocal language in the Plan. Debtor's counsel could not rely on the form

26  plan's boilerplate provisions when she knew the circumstances of her client's case

27  were unique. At a minimum, the Plan needed to provide (1) that the prepetition

28  foreclosure sale be set aside and Rustling Oaks' Certificate of Foreclosure Sale

1  rescinded; (2) that the sale proceeds received by all parties, including the $18,836

2  paid to MCA, be refunded back to Rustling Oaks; and (3) that MCA's assessment lien

3  be reinstated. Without these additional provisions, it was reasonable for MCA and

4  Guralnick to ignore Debtor's Plan. The Plan, in its current form, did not signal

5  Debtor's intention to undo the foreclosure sale or to take away Rustling Oaks'

6  interest in the property.[20]

7      Due to the lack of notice, Rustling Oaks is not bound by Debtor's confirmed

8  Plan, and its interest in the Residence remains unaffected by the Plan's provisions.

9  Therefore, nothing precludes Rustling Oaks from moving for stay relief at this time.

10  3.4. **The Postpetition Delivery and Recordation of the Trustee's Deed**.

11      Debtor also objects to Guralnick's postpetition delivery and recordation of the

12  Trustee's Deed, actions taken to transfer and perfect Rustling Oaks' legal title in the

13  Residence[21] but without this Court's approval. According to Debtor, these

14  unauthorized acts violated the automatic stay. See 11 U.S.C. § 362(a)(3) (barring acts

15  "to obtain possession of property of the estate or of property from the estate or to

16  exercise control over property of the estate"); Jewett v. Shabahangi (In re Jewett),

17  146 B.R. 250, 252 (B.A.P. 9th Cir. 1992) (holding that postpetition recordation of

18  trustee's deed was "an action against property of the estate" violating the stay),

19  superseded by statute, 1993 Cal. Legis. Serv. ch. 724, § 3 (West) (codified as amended

20  at Cal. Civ. Code § 2924h(c)). These stay violations would, in turn, be void. See

21  Schwartz v. United States (In re Schwartz), 954 F.2d 569, 571 (9th Cir. 1992).

22

23      [20] These deficiencies demonstrate why Ivory has no application in this case. In Ivory,
    the county was the foreclosing lienholder and the purchaser, and the amount of the debt was

24  the same as the purchase price. See 70 F.3d at 74. That was why the debtor's plan that
    "cure[s] the property tax default," as well as "redeem[s] the real property," could be binding

25  on the county. Id.

26      [21] In a nonjudicial foreclosure sale under California law, title to real property is
    transferred to the purchaser typically by delivery of the trustee's deed, see Dover Mobile

27  Estates v. Fiber Form Prods., Inc., 220 Cal. App. 3d 1494, 1498 (1990), and recordation of
    that deed perfects the purchaser's interest, see Walker v. Cal. Mortg. Serv. (In re Walker),

28  861 F.2d 597, 600 (9th Cir. 1988).

1    Since Rustling Oaks' ownership of the Residence is premised on what Debtor

2    contends is an invalid Trustee's Deed, Debtor essentially argues that title has not

3    been perfected and that any unlawful detainer proceeding to evict him is premature

4    at this time. See Cal. Civ. Proc. Code § 1161a(b)(3) (allowing purchaser to remove

5    holdover owner from property but only if "title under the sale has been duly

6    perfected"); see also Malkoskie v. Option One Mortg. Corp., 188 Cal. App. 4th 968,

7    974–75 (2010). It would follow that stay relief for Rustling Oaks should be denied.

8    However, this argument fails for a number of reasons.

9        3.4.1.  The Ministerial Acts Exception.

10    First, Guralnick's delivery of the Trustee's Deed constitutes a ministerial act

11    that does not violate the automatic stay. The Ninth Circuit has adopted the

12    ministerial acts exception, which provides that the automatic stay does not prohibit

13    "[m]inisterial acts or automatic occurrences that entail no deliberation, discretion, or

14    judicial involvement" on the part of an actor. McCarthy, Johnson & Miller v. N. Bay

15    Plumbing, Inc. (In re Pettit), 217 F.3d 1072, 1080 (9th Cir. 2000). "[W]hen an [actor]'s

16    duty is delineated by, say, a law or a judicial decree with such crystalline clarity that

17    nothing is left to the exercise of the [actor]'s discretion or judgment, the resultant act

18    is ministerial." Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 974 (1st

19    Cir. 1997).

20    Courts have determined that this exception extends to an actor's postpetition

21    execution, delivery, or recordation of a deed following a prepetition foreclosure or tax

22    sale when the applicable law obligates the actor to take those actions and provides

23    the actor with no discretion. See, e.g., Tracht Gut, LLC v. Cnty. of L.A. Treasurer &

24    Tax Collector (In re Tracht Gut, LLC), 503 B.R. 804, 812 (B.A.P. 9th Cir. 2014)

25    (finding no stay violation when county tax collector had no discretion in recording

26    deed under California Revenue and Taxation Code § 3708.1); In re Pineda-Pineda,

27    510 B.R. 648, 653–54 (Bankr. D. Or. 2014) (dicta) (concluding that there would be no

28    stay violation when county tax collector issues and records deed due to lack of

discretion under Oregon Revised Statutes § 312.200); In re Rugroden, 481 B.R. 69, 79 (Bankr. N.D. Cal. 2012) (finding no stay violation when IRS official had no discretion in executing deed under 26 U.S.C. § 6338(b)).

This case is no different. The applicable California statute reads, "If the redemption price is not deposited pursuant to Section 729.060 before the expiration of the redemption period, . . . the nonjudicial foreclosure trustee pursuant to Section 729.035 shall deliver an executed trustee's deed and comply with the requirements of Section 2924j of the Civil Code." Cal. Civ. Proc. Code § 729.080(a) (emphasis added).

The original 90-day redemption period expired on January 8, 2014, and the additional 60-day extension period under § 108(b) expired on March 9, 2014. Both deadlines passed without Debtor depositing the redemption price with Guralnick. With the statute's condition precedent met, Guralnick, as the foreclosure trustee, was obligated by the statute to deliver the executed Trustee's Deed to Rustling Oaks, which it did on August 1, 2014.[22] Because California Code of Civil Procedure § 729.080(a) left Guralnick with no discretion, its delivery of the Trustee's Deed must be considered a ministerial act that does not violate the automatic stay.

3.4.2.  The Perfection of Interests Exception Under § 362(b)(3).

Second, Guralnick's postpetition recordation of the Trustee's Deed falls within the automatic stay exception under § 362(b)(3), which states that the automatic stay does not bar "any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title." 11 U.S.C. § 362(b)(3). Section 546(b), in turn, sets forth that the trustee's rights and powers are subject to

---

[22] The record only shows that Guralnick executed the Trustee's Deed on July 28, 2014, and recorded it on August 1, 2014, but there was no declaration or other evidence concerning when Guralnick delivered the Trustee's Deed to Rustling Oaks. Nevertheless, since Guralnick and Rustling Oaks do not contest the fact that the Trustee's Deed has been delivered, the Court will assume that the delivery took place no later than the date of recordation.

1   any generally applicable law that permits any act to perfect, or to maintain or

2   continue the perfection of, an interest in property to be effective against an entity

3   that acquires rights in such property before the date on which action is taken to

4   effect such perfection, maintenance, or continuation. <u>Id.</u> § 546(b)(1)(A), (B). Put

5   another way, a party's postpetition perfection of its interest in estate property will

6   not violate the stay if state law allows that party's interest to be superior to the

7   interest of any entity (such as a trustee acting as a hypothetical bona fide purchaser)

8   who obtains its interest prior to the date that the act to perfect is performed. <u>See</u>

9   <u>Hayden v. Wells (In re Hayden)</u>, 308 B.R. 428, 432 (B.A.P. 9th Cir. 2004).

10      An interest in real property is not perfected until a document conveying the

11   interest has been recorded with the county recorder. <u>See</u> <u>Walker</u>, 861 F.2d at 600.

12   Under California's race-notice recording statute, a subsequent purchaser of real

13   property has priority over an unrecorded conveyance if the purchaser is a bona fide

14   purchaser for value who recorded its conveyance first. <u>See</u> Cal. Civ. Code §§ 1213–

15   1215. However, there are exceptions permitting a subsequently recorded conveyance

16   to relate back and take priority over another that was recorded first.

17      One such exception, commonly invoked in bankruptcy cases, is California Civil

18   Code § 2924h(c), which provides that a purchaser's title to real property sold at a

19   trustee's sale is "deemed perfected as of 8 a.m. on the actual date of sale if the

20   trustee's deed is recorded within 15 calendar days after the sale." A purchaser, who

21   records its trustee's deed postpetition but within 15 days of the prepetition sale,

22   would prevail over a hypothetical bona fide purchaser and would not violate the

23   automatic stay under § 362(b)(3). <u>See</u> <u>Bebensee-Wong v. Fed. Nat'l Mortg. Ass'n (In</u>

24   <u>re Bebensee-Wong)</u>, 248 B.R. 820, 822–23 (B.A.P. 9th Cir. 2000). If the postpetition

25   recordation of the trustee's deed occurs after the 15-day period, then the perfection

26   does not relate back to the sale date. <u>In re Garner</u>, 208 B.R. 698, 701 (Bankr. N.D.

27   Cal. 1997). The recordation violates the stay, and the purchaser's title is subject to

28   avoidance by the trustee. <u>Id.</u>

1    There is no comparable California statute for those who purchase real property

2  at a trustee's sale subject to redemption, such as Rustling Oaks.[23] Nevertheless,

3  California case law explains that Rustling Oaks' title would still defeat the trustee's

4  avoidance powers due to the Certificate of Foreclosure Sale, a document executed and

5  recorded prepetition by Guralnick.

6    Although the relevant statute says little about a certificate of sale,[24] related

7  case law explains the legal significance of this document.[25] The certificate of sale is

8  an instrument in which title is created within the meaning of California Civil Code

9  § 1107, Foorman, 75 Cal. at 556, as well as "a conveyance within the meaning of the

10  recording act [California Civil Code § 1215], by which [the purchaser] is protected

11  from the unrecorded claims of others, of which [the purchaser] did not have notice,"

12  Duff v. Randall, 116 Cal. 226, 231 (1897). As a result, recordation of the certificate

13  "charges all subsequent purchasers with notice of the purchaser's title." Hansen v. G

14  & G Trucking Co., 236 Cal. App. 2d 481, 495 (1965). The deed, once delivered after

15  expiration of the redemption period, "gives to the purchaser no new title to the land

16  purchased by him, but is merely evidence that the title has become absolute." Pollard

17

18    [23] California Civil Code § 2924h(c)'s 15-day relation-back period obviously cannot
19  apply because the earliest a trustee's deed in a trustee's sale subject to redemption can be
   recorded is 90 days after the foreclosure sale when the right of redemption expires. Cf. Cal.
20  Civ. Code § 5710(a) (making only California Civil Code §§ 2924, 2924b, and 2924c applicable
   in a trustee's sale by a homeowners' association on its assessment lien).

21    [24] All that California Code of Civil Procedure § 729.040 provides is (1) that following a
22  purchaser's payment of its successful bid, a foreclosure trustee must "execute and deliver a
   certificate of sale to the purchaser and record a duplicate of the certificate of sale in the office
23  of the county recorder," Cal. Civ. Proc. Code § 729.040(a), and (2) that the certificate of sale
   must include a description of the property sold, the date of the foreclosure sale, the price paid
24  for the property, and a statement that the property is subject to a right of redemption, see id.
   § 729.040(b), (c).

25    [25] Section 729.040, governing the certificate of sale issued in foreclosure sales, is
26  modeled after former § 700a of the California Code of Civil Procedure, which was in effect
   until 1983 and governed the certificate of sale issued in execution sales. See Legis. Comm.
   Comments to Cal. Civ. Proc. Code § 729.040 (1982) (stating that § 729.040 "continues the
27  substance of a portion of subdivision (a) of former Section 700a"). Since there are no
   published decisions examining certificates of sale under § 729.040 and their effect, the
28  decisions considering certificates of sale under former § 700a are instructive.

1  v. Harlow, 138 Cal. 390, 393 (1903) (internal quotation marks omitted) (citing

2  Robinson v. Thornton, 102 Cal. 675, 680 (1893)).

3        The superiority of Rustling Oaks' title is demonstrated by Foorman v. Wallace,

4  75 Cal. 552 (1888). There, a debtor conveyed his real property to an initial transferee,

5  but the initial transferee did not record his deed at that time. Id. Thereafter, the

6  defendant sued and obtained a judgment against the debtor. Id. The judgment was

7  then enforced via a sheriff's execution sale, where the defendant, who had no actual

8  knowledge of the debtor's prior conveyance, purchased the same real property subject

9  to a right of redemption. Id. The sheriff's certificate of sale was recorded shortly

10  afterwards. Id. When no redemption was made, a sheriff's deed was delivered to the

11  defendant. Id. However, after the certificate of sale was recorded but less than a

12  month before the sheriff's deed was delivered, the initial transferee finally recorded

13  his deed. Id. Over a year later, the initial transferee conveyed to the plaintiff by deed.

14  Id. The plaintiff then brought an action against the defendant over the property. Id.

15        On appeal, the California Supreme Court had to address whether the

16  defendant's title to the real property was paramount to that of the initial transferee

17  when the initial transferee's deed was recorded before the sheriff's deed but after the

18  certificate of sale. See id. at 553–54. The court answered in the affirmative and ruled

19  in favor of the defendant. See id. at 558.

20        The court first found that the defendant, despite being a judgment creditor

21  purchasing property at his own execution sale, was a bona fide purchaser for value.

22  Id. at 554. Then, reasoning that the certificate of sale is "evidence of the equitable

23  interest which the purchaser has in the land," the court determined that "the

24  certificate of sale given by the sheriff to [the defendant] was an instrument whereby

25  he acquired . . . title." Id. at 556–57, 558. Recordation of the certificate of sale, it

26  followed, had the effect of "impart[ing] constructive notice to all the world" of the

27  defendant's title. Id. at 558. Since the defendant's certificate of sale was recorded

28  before the initial transferee's deed (under which the plaintiff claimed) and the

1  defendant had no actual notice of that deed, the court concluded that the defendant's

2  title was superior to the title claimed by the initial transferee and the plaintiff. Id.

3      Here, the Certificate of Foreclosure Sale was recorded shortly after the

4  foreclosure sale and almost three months before the petition was filed. Despite the

5  postpetition recordation of the Trustee's Deed, Rustling Oaks has priority over a

6  hypothetical bona fide purchaser who perfected its interest on the petition date.

7  Rustling Oaks was a purchaser for value, having paid $36,000 for the Residence, and

8  its conveyance, in the form of the Certificate of Foreclosure Sale, was recorded first

9  and prior to the petition date. It follows that the recordation of the Trustee's Deed,

10  which gave Rustling Oaks no new title, was an act to maintain or continue the

11  perfection of its title in the Residence that does not violate the stay under § 362(b)(3).

12      3.4.3.  Retroactive Annulment of the Stay.

13      Lastly, Debtor ignores Rustling Oaks' prayer for retroactive annulment of the

14  automatic stay. Section 362(d) "gives the bankruptcy court wide latitude in crafting

15  relief from the automatic stay, including the power to grant retroactive relief from

16  the stay." Schwartz, 954 F.2d at 572. By retroactively annulling the stay, a court can

17  validate an otherwise void act. See Algeran, Inc. v. Advance Ross Corp., 759 F.2d

18  1421, 1425 (9th Cir. 1985).

19      To determine whether retroactive relief is justified, the bankruptcy court must

20  balance the equities on a case-by-case basis. Nat'l Envtl. Waste Corp. v. City of

21  Riverside (In re Nat'l Envtl. Waste Corp.), 129 F.3d 1052, 1055 (9th Cir. 1997). This

22  necessarily requires a court to engage in a multifactor analysis.[26] See Palm v.

23      [26] The Ninth Circuit BAP has formulated twelve factors for this analysis: (1) the
24  number of bankruptcy filings; (2) whether the circumstances of a repeat filing indicate an
   intention to delay or hinder creditors; (3) prejudice to creditors or third parties, including
   bona fide purchasers, if stay relief is not retroactive; (4) the debtor's overall good faith
25  conduct; (5) whether the creditors knew of the stay but nevertheless took action; (6) whether
   the debtor is complying with the Bankruptcy Code and Rules; (7) the relative ease of
26  restoring the parties to the status quo ante; (8) the costs of annulment to the debtor and
   creditors; (9) how quickly creditors moved for annulment, or how quickly the debtor moved to
27  set aside the violative conduct; (10) whether creditors, after learning of the bankruptcy,
   proceeded to continue violating the stay or moved expeditiously to gain relief; (11) whether
28  annulment will cause irreparable injury to the debtor; and (12) whether stay relief will

1  Klapperman (In re Cady), 266 B.R. 172, 179–80 (B.A.P. 9th Cir. 2001), aff'd sub nom.

2  Palm v. Cady (In re Cady), 315 F.3d 1121 (9th Cir. 2003) (adopting the BAP's opinion

3  as its own). Here, balancing the equities of this case favors granting retroactive

4  annulment of the stay to validate Guralnick's postpetition delivery and recordation of

5  the Trustee's Deed.

6      Only two factors favor denying retroactive relief. First, MCA and Guralnick

7  both knew and had notice of Debtor's bankruptcy, but Guralnick still proceeded to

8  record the Trustee's Deed without obtaining stay relief beforehand. Guralnick is not

9  a completely innocent actor. Second, restoring the parties to the status quo ante is a

10 relatively simple exercise; all that must be done is for this Court to void the Trustee's

11 Deed.[27] These factors, however, are outweighed by the other, more significant ones.

12     To start with, Debtor's and his counsel's conduct, like Guralnick's, was also not

13 exemplary. Despite knowing that there had been a prepetition foreclosure sale,

14 Debtor's counsel made no attempts to figure out who purchased the Residence and to

15 notify the purchaser about Debtor's bankruptcy and his Plan that supposedly

16 impacted the purchaser's interests. Debtor's counsel also did not draft the Plan in a

17 manner that unambiguously expressed Debtor's intention to exercise his right of

18 redemption. Additionally, Debtor's counsel failed to proactively act to protect her

19 client's interests, waiting until Rustling Oaks filed this stay relief motion in October

20 2014 to bring all of these issues to the Court's attention. Even though Guralnick

21 explained its position to Debtor's counsel in May 2014 and informed her of its

22

23 _____

24 promote judicial economy or other efficiencies. Fjeldsted v. Lien (In re Fjeldsted), 293 B.R.
   12, 25 (B.A.P. 9th Cir. 2003). The Ninth Circuit has also mentioned a debtor's failure to

25 object to violative conduct despite knowledge of that conduct and the bankruptcy court's
   belief that it would have granted stay relief had the violating party moved for it beforehand

26 as other valid factors. See Nat'l Envtl. Waste Corp., 129 F.3d at 1055–56. This Court's
   discussion only addresses those factors relevant to this case.

27     [27] At the second hearing on the motion, Rustling Oaks' counsel stated that Rustling
   Oaks incurred additional costs after the foreclosure sale. However, no evidence of those costs

28 was submitted, so they are not part of the Court's record at this time.

1  intention to record the Trustee's Deed in July 2014, Debtor's counsel still did nothing

2  despite previously threatening to file an adversary proceeding.

3        Further, although Debtor will suffer irreparable injury if retroactive relief is

4  granted (i.e., losing his Residence), Debtor's loss is an inevitable one. Rustling Oaks

5  successfully purchased the Residence subject only to Debtor's right of redemption.

6  Since Debtor has not redeemed within the required time and he cannot and has not

7  confirmed a plan that effectively redeems the Residence, there is nothing that Debtor

8  can do, at this point, to save his Residence indefinitely. Rustling Oaks is ultimately

9  entitled to have title to the Residence.

10       The denial of retroactive relief would only offer Debtor temporary relief; it

11  would not somehow undo the foreclosure sale. Rather, if annulment is denied, that

12  would just mean that Guralnick has to file its own stay relief motion in order to

13  redeliver and re-record the Trustee's Deed, a motion that would certainly be granted.

14  Debtor would have no basis for arguing for the denial of that motion because

15  Rustling Oaks is entitled to have legal title to the Residence and to have the

16  Trustee's Deed delivered and recorded. Granting retroactive relief now, as a result,

17  promotes judicial economy by saving Guralnick the costs and efforts of filing and

18  litigating a new stay relief motion.

19       Based on a consideration of the relevant factors, retroactive annulment of the

20  automatic stay is appropriate. If Guralnick's postpetition delivery and recordation of

21  the Trustee's Deed were somehow acts that violated the automatic stay and were not

22  covered by any exception, these otherwise void acts are now valid.

23    3.5. **Cause for Relief from the Automatic Stay under § 362(d)(1)**.

24       The Court having rejected each of Debtor's arguments, the only remaining

25  issue is whether there is cause under § 362(d)(1) to grant Rustling Oaks relief from

26  the automatic stay to initiate its unlawful detainer proceeding against Debtor.

27       Cause is not defined by the Bankruptcy Code, so it must be determined on a

28  case-by-case basis. Christensen v. Tucson Estates, Inc. (In re Christensen), 912 F.2d

1162, 1166 (9th Cir. 1990). After a prepetition foreclosure sale of the debtor's
property and prepetition recordation of the trustee's deed, the debtor no longer holds
equitable or legal title to the property and the filing of a petition cannot reinstate the
debtor's title. Edwards v. Wells Fargo Bank, N.A. (In re Edwards), 454 B.R. 100, 106
(B.A.P. 9th Cir. 2011). "Instead, the debtor is essentially a 'squatter,' and thus cause
for relief from stay is established." Id. This case is slightly more complicated than
that, but Rustling Oaks has still established cause for granting relief.

A prepetition foreclosure sale of the Residence took place, but it was subject to
Debtor's statutory right of redemption. Debtor filed his petition prior to the
redemption period expiring and prior to the delivery and recordation of the Trustee's
Deed. Yet, Debtor did not exercise his right of redemption before the original
deadline under California law or the extended deadline under bankruptcy law. He
also did not confirm a plan that effectively redeemed the property or set aside the
foreclosure sale. He has therefore lost his right of redemption.

Further, given the Court's ruling that the delivery and recordation of the
Trustee's Deed either do not violate the stay or are validated by retroactive
annulment of the stay, legal title to the property has been transferred and perfected.
Debtor no longer has a title interest in the property.

All that remains is Debtor's possessory interest in the property. But because
the redemption period has expired, Debtor is no longer entitled to legally possess the
property. See First Nat'l Trust & Sav. Bank of San Diego v. Staley, 219 Cal. 225, 227
(1933). Instead, Debtor is a holdover owner following a foreclosure sale, occupying the
property without a lease with the purchaser. Therefore, he is essentially a squatter,
which establishes cause under § 362(d)(1).

4.  CONCLUSION.

For the foregoing reasons, the Court will grant Rustling Oaks' motion. Cause
exists under § 362(d)(1) to grant relief from the automatic stay, and retroactive
annulment of the stay is appropriate under the circumstances. The postpetition

1  delivery and recordation of the Trustee's Deed by Guralnick, acting on behalf of

2  MCA, are not void acts. Rustling Oaks, as the entity holding valid title to the

3  Residence, is permitted to initiate an unlawful detainer proceeding against Debtor.

4  But due to a high probability of an appeal by Debtor, Rustling Oaks' requested

5  waiver of the fourteen-day stay under Bankruptcy Rule 4001(a)(3) will be denied.

6         Counsel for Rustling Oaks is to lodge an order consistent with this

7  memorandum decision within seven days.

8                                                  ###

Date: January 20, 2015

Scott H. Yun
United States Bankruptcy Judge